*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

REGINALD CU-NU GRASTY,

        Defendant-Appellant.

UNPUBLISHED
November 16, 2023

No. 361647
St. Clair Circuit Court
LC No. 21-000287-FC

Before: BOONSTRA, P.J., and GADOLA and MALDONADO, JJ.

PER CURIAM.

Defendant appeals by right his jury-trial convictions of first-degree premediated murder, MCL 750.316(1)(a), and mutilation of a dead body, MCL 750.160. The trial court sentenced defendant to life imprisonment without parole for the murder conviction and a concurrent prison term of 5 to 10 years for the mutilation conviction. We affirm.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

Defendant's convictions arise from the killing of William Orlow aboard the Grayfox, which is a United States Naval Sea Cadet Ship, in late 2019 or early 2020. At the time, the ship was moored in Port Huron, Michigan and was used to train Sea Cadet youths. One of the ship's captains, James Semerad, would drive to the ship on Fridays after work, stay Friday night aboard the ship, and then return to his home in Clarkston either Saturday or Sunday.

Semerad testified at trial that he met Orlow in early September 2019 and agreed to allow Orlow to serve as an engineer on board the ship. As the engineer, Orlow was to live on the ship and care for its equipment. Shortly thereafter, Orlow introduced defendant to Semerad. Orlow insisted that defendant could help crew the ship, and Semerad agreed to allow defendant to join the crew as a deck hand. Orlow and defendant eventually agreed that defendant would reside on the main deck in the chief mate's quarters and Orlow would reside on the lower deck in a berthing room that contained a triple-layer bunk bed. Orlow slept on the bottom bunk.

-1-

On one occasion in late September or early October 2019, Semerad noticed that Orlow was "obviously intoxicated" and he had a conversation with Orlow about his unacceptable behavior. In response, Orlow left the ship. That was the last time Semerad saw Orlow alive.

Semerad continued to visit the ship on weekends, and last saw defendant on January 11, 2020. Defendant was absent on each subsequent visit by Semerad. Semerad testified that it was as though defendant "simply disappeared." On January 30, Semerad cleaned the cabin in which defendant had been staying.

In late May 2020, a new person joined the crew and took on a role similar to what defendant's had been. On May 29, Semerad and the new deck hand took all of defendant's clothing, put it into a plastic garbage bag and a laundry bag, and left the bags in a closet in a different portion of the ship. The two proceeded to power-wash portions of the ship, including hallways and the rooms where defendant and Orlow had stayed. The ship was power-washed again on June 20, 2020.

Semerad testified that after some electrical work was performed on the ship on June 23, 2020, he plugged in a chest freezer on the bottom deck to verify that an outlet had been repaired. When he opened the freezer, he noticed a very strong, rancid stench and saw what he thought were moldy items. Upon further inspection, Semerad realized that it was a dead body and called the police. The body was later identified, through dental records, as Orlow's. All four limbs had been severed from Orlow's body; the limbs were found in two plastic garbage bags in the freezer, underneath the rest of Orlow's body.

Shane Hill, a forensic scientist with the Michigan State Police, testified that he and other forensic scientists responded to the ship on June 23, 2020 to process the crime scene. Scientists went room-by-room and area-by-area to search the ship for anything that looked out of place or that might relate to the crime. During the search, Hill found a black garbage bag inside a clothes dryer. Eighteen fingerprints and three palm prints on the garbage bag were later identified as being defendant's. Inside the bag was a wool blanket that was covered with blood. Also inside the bag was a dark green T-shirt that was very wet to the touch and tested positive for blood. Hill also noticed a fire axe hanging in the galley. The axe blade and axe handle tested positive for blood. Other areas of the ship also tested positive for blood, including the bottom drawers in defendant's quarters, the landing leading from the main deck to the lower deck,[1] many areas in the crew wash room,[2] and many areas in the berthing room where Orlow had stayed. In the berthing room, Hill found a "significant amount of blood" on the mattress of the lower bunk. Underneath the mattress, Hill also saw blood staining on a wooden slat that was supporting the mattress. The wooden slat was also nicked in several places. During his search of the ship, Hill found the laundry bag and garbage bag that Semerad had left in a closet containing defendant's clothing. Much of the

_____

[1] Near this concrete landing area, Hill also observed several striations or marks in the concrete.

[2] The crew wash room was located directly across from the berthing room in which Orlow had stayed. Among the areas where blood was found in the wash room were the floor near a drain, the wall near the sink, the soap dispenser, the sink, shower curtains, and the shower floor.

clothing, including a gray sweatshirt and a pair of jeans, appeared to have blood stains on them. Two different pairs of shoes (a brown pair sized 10.5 and a white pair sized 12) were found in the bags, and they had blood on them as well. Almost two dozen knives were found in the galley, but none tested positive for blood.[3]

Many of the collected items were tested for DNA. Rebecca Madden from the Michigan State Police Laboratory testified that the axe head bloodstain had one contributor, and there was very strong support[4] that it was Orlow. The axe handle had two contributors, with there being very strong support that Orlow was one of the contributors and very strong support that defendant was the other contributor. The mattress bloodstain came from one individual, and there was very strong support that Orlow was the contributor. There was very strong support that Orlow was a DNA contributor to all of the clothing items (gray sweatshirt, jeans, both pairs of shoes). There was very strong support that defendant also contributed DNA to these clothing items, except for the jeans, in which there was only strong support that he was a contributor.

Dr. Daniel Spitz, the chief medical examiner for St. Clair County, opined that because of the advanced decomposed state of the body, Orlow had been dead for "many months." Orlow had numerous injuries, including both blunt-force trauma and sharp-force injuries. The blunt-force trauma was primarily found on the head, but other areas were affected as well. The stab wounds were extensive to the face, neck, chest, abdomen, back, and extremities. Orlow had suffered multiple skull fractures and rib fractures. Tissue around his eyes had been removed and both eyes had been punctured. One of the holes in the skull matched "perfectly" with the pick portion of the axe that was retrieved from the ship. Dr. Spitz also opined that the axe was consistent with the type of instrument used to dismember the body.

Overall, Dr. Spitz identified five sharp-force injuries to the neck, 17 sharp-force injuries on Orlow's right arm, and eight sharp-force injuries on Orlow's left arm, with many of these arm injuries being defensive in nature. These injuries were consistent with Orlow lying in his bunk with his right side on the opening side of the bunk. There were six sharp-force injuries on the right leg, one incised wound on the left thigh, and more than 30 sharp-force injuries to the back and buttocks. Dr. Spitz testified that these stab wounds were caused by a knife of some type. Dr. Spitz's ultimate conclusion was that Orlow died from multiple blunt- and sharp-force injuries and that the manner of death was homicide.

---

[3] Semerad testified that at some point after defendant disappeared and before Orlow's body was found, he took the knives home during one of his episodes of cleaning the ship and washed them in the dishwasher.

[4] Madden explained that, consistent with the recommendation of an organization referred to as Scientific Working Group on DNA Analysis Methods, the Michigan State Police uses descriptive text with their numerical findings. Anything over 1,000,000 times more likely is considered to be "very strong support," and anything that is 10,000 to 1,000,000 times more likely is considered to be "strong support." There are also lesser categories of "moderate support," "limited support," "uninformative," and "excluded."

Defendant was located in Detroit approximately a year after his disappearance. On January 19, 2021, defendant was arrested by the Detroit Fugitive Apprehension Team and was transported back to Port Huron.

At trial, defendant presented no evidence. Defendant requested a jury instruction on voluntary manslaughter as a lesser offense, but the trial court ruled that there was no evidence that warranted such an instruction. The jury was also given a flight instruction.

Defendant was convicted and sentenced as described. This appeal followed.

## II. SUFFICIENCY OF THE EVIDENCE

Defendant argues that there was insufficient evidence to support his first-degree murder conviction. We disagree. We review de novo a challenge to the sufficiency of the evidence by viewing the evidence in a light most favorable to the prosecution to determine "whether any rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt." *People v Cline*, 276 Mich App 634, 642; 741 NW2d 563 (2007). "All conflicts with regard to the evidence must be resolved in favor of the prosecution. Circumstantial evidence and reasonable inferences drawn from it may be sufficient to prove the elements of the crime." *People v Wilkens*, 267 Mich App 728, 738; 705 NW2d 728 (2005) (citation omitted).

"To establish first-degree premeditated murder, the prosecutor must prove that the defendant intentionally killed the victim with premeditation and deliberation." *People v Taylor*, 275 Mich App 177, 179; 737 NW2d 790 (2007). Defendant does not contest that there was sufficient evidence to show that he had intentionally killed Orlow, but argues that there was insufficient evidence to establish premeditation and deliberation.

"Since the distinguishing elements of first-degree murder ultimately resolve themselves into questions of fact, minimum standards of proof, if reasonably related to the circumstances which must be proved, will serve to preserve the distinction between first-degree and second-degree murder." *People v Oros*, 502 Mich 229, 241; 917 NW2d 559 (2018) (quotation marks and citation omitted). "[W]hen considering a sufficiency-of-the-evidence issue, the question is whether the evidence introduced at the trial fairly supports an inference of premeditation and deliberation." *Id*. at 242 (quotation marks, citation, and brackets omitted).

Premeditation and deliberation require sufficient time to allow the defendant to reconsider his actions, or in other words, sufficient time to "take a second look." *People v Abraham*, 234 Mich App 640, 656; 599 NW2d 736 (1999). "That is, some time span between the initial homicidal intent and ultimate action is necessary to establish premeditation and deliberation, but it is within the province of the fact-finder to determine whether there was sufficient time for a reasonable person to subject his or her action to a second look." *Oros*, 502 Mich at 242 (quotation marks and citation omitted). "While the minimum time necessary to exercise this process is incapable of exact determination, it is often said that premeditation and deliberation require only a brief moment of thought or a matter of seconds. *Id*. at 242-243 (quotation marks, citations, and brackets omitted).

"The requisite state of mind may be inferred from defendant's conduct judged in light of the circumstances." *Id*. at 243 (quotation marks and citation omitted). "In other words, what constitutes sufficient evidence to support the elements of premeditation and deliberation may vary

from case to case because the factual circumstances will vary, but the ultimate answer may be resolved in determining whether reasonable inferences may be made to support the fact-finder's verdict." *Id*. at 243-244.

In this instance, there was sufficient evidence to allow the jury to find that defendant had killed Orlow with premeditation and deliberation. It is undisputed that Orlow had suffered a great many injuries from at least one sharp weapon such as a knife, and the bloodstains on the mattress in Orlow's room supported an inference that he was stabbed while lying on the bunk bed in his room. The evidence indicated that there were knives in the ship's galley, and that to go from the galley to the room where Orlow was killed required climbing down ten steps on a ladder. A jury could infer from this evidence that defendant formed the initial intent to kill sometime before or while taking a knife from the galley, and that he had time to take "second look" during the climb and walk to Orlow's room. This is sufficient to support the first-degree murder conviction.

Moreover, although Dr. Spitz testified that Orlow's limbs likely were severed with an instrument like the fireman's axe after he was dead, Dr. Spitz thought that the trauma to Orlow's head could have been a cause of death. He also opined that the "pick" end of the fireman's axe could have delivered that blow. From this evidence, the jury could have concluded that defendant first inflicted multiple stab sounds upon Orlow with a knife and then delivered the killing blow with the axe. To do so would have required him to have initially brought the axe with him or to have gone back upstairs to retrieve the axe after incapacitating Orlow with the knife. In either case, the jury could reasonably infer premeditation and deliberation from such conduct. *Oros*, 502 Mich at 243-244.

In sum, there was sufficient evidence to support defendant's conviction of first-degree, premeditated murder. *Id.* at 242-244.

### III. VOLUNTARY MANSLAUGHTER INSTRUCTION

Defendant argues that he was denied the right to present a defense when the trial court declined to instruct the jury regarding voluntary manslaughter. We disagree.

To preserve the issue that a defendant was denied the right to present a defense, the defendant must raise the issue in the trial court. See *People v Bosca*, 310 Mich App 1, 46; 871 NW2d 307 (2015), rev'd in part on other grounds 509 Mich 851 (2022). Likewise, to preserve a claim of instructional error for failure to give an instruction, a defendant must have requested the instruction. *People v Sabin (On Second Remand)*, 242 Mich App 656, 657; 620 NW2d 19 (2000). Although defendant requested an instruction on voluntary manslaughter, he did not argue that the failure to provide such an instruction infringed on his right to present a defense. Accordingly, the constitutional issue is not preserved, but the claim of instructional error is preserved.

Preserved claims of instructional error generally are reviewed de novo, but the trial court's determination whether a jury instruction is applicable to the facts of the case is reviewed for an abuse of discretion. *People v Dobek*, 274 Mich App 58, 82; 732 NW2d 546 (2007). Unpreserved claims of constitutional error are reviewed for plain error affecting substantial rights. *People v Carines*, 460 Mich 750, 752-753; 597 NW2d 130 (1999); *People v Cross*, 281 Mich App 737, 738; 760 NW2d 314 (2008).

As previously noted, "[t]o establish first-degree premeditated murder, the prosecutor must prove that the defendant intentionally killed the victim with premeditation and deliberation." *Taylor*, 275 Mich App at 179. All other murders are murders in the second degree. *People v Mendoza*, 468 Mich 527, 534; 664 NW2d 685 (2003), citing MCL 750.317. "Manslaughter is murder without malice." *Mendoza*, 468 Mich at 534. To prove voluntary manslaughter, "one must show that the defendant killed in the heat of passion, the passion was caused by adequate provocation, and there was not a lapse of time during which a reasonable person could control his passions." *Id*. at 535. But notably, "provocation is not an element of voluntary manslaughter. Rather, provocation is the circumstance that negates the presence of malice." *Id*. at 536. In order for the provocation to be adequate, it must be that which would cause a reasonable person to lose control. *People v Tierney*, 266 Mich App 687, 715; 703 NW2d 204 (2005).

A criminal defendant has the right to a properly instructed jury. *People v Spaulding*, 332 Mich App 638, 653; 957 NW2d 843 (2020). "[T]he trial court is required to instruct the jury concerning the law applicable to the case and fully and fairly present the case to the jury in an understandable manner." *People v Mills*, 450 Mich 61, 80; 537 NW2d 909 (1995), mod 450 Mich 1212 (1995). "The jury instructions must include all the elements of the charged offenses and any material issues, defenses, and theories that are supported by the evidence." *People v Montague*, 338 Mich App 29, 37; 979 NW2d 406 (2021) (quotation marks and citation omitted).

Because manslaughter is a necessarily included lesser offense of murder, " 'an instruction for manslaughter must be given *if supported by a rational view of the evidence*.' " *People v Yeager*, ___ Mich ___, ___; ___ NW2d ___ (2023) (Docket No. 164055); slip op at 7 (emphasis added), quoting *Mendoza*, 468 Mich at 541.[5] In this case, defendant fails to identify any evidence to show that an instruction on manslaughter was warranted.[6] An appellant may not merely announce a position and leave it to this Court to rationalize the basis for the claims or to search the record for evidence in support of that position. *People v Traylor*, 245 Mich App 460, 464; 628 NW2d 120 (2001); *People v Kelly*, 231 Mich App 627, 640-641; 588 NW2d 480 (1998). Further, our review of the record does not reveal any evidence presented at trial suggesting that defendant was provoked by Orlow and killed him in heat of passion. See *People v Mitchell*, 301 Mich App 282, 286; 835 NW2d 615 (2013). Rather, the trial evidence suggests that Orlow was initially attacked

---

[5] We note that "[n]ecessarily included lesser offenses are distinguishable from cognate offenses." *People v Wilder*, 485 Mich 35, 41; 780 NW2d 265 (2010). A cognate lesser offense is one that shares some common elements with and is of the same class as the greater offense but also has elements not found in the greater. *Id*. In the trial court, the parties and the court referred to manslaughter as a cognate offense of murder because it has elements that do not appear in murder. This is erroneous. As explained, manslaughter is a necessarily lesser included offense of murder because the only difference is that murder requires the presence of malice. *Mendoza*, 468 Mich at 540.

[6] When requesting the manslaughter instruction in the trial court, defense counsel did not rely on any evidence, but merely argued that one should be given because the defense should be able to "throw out different theories." In his brief on appeal, defendant cursorily states that "[a] rational view of the evidence in the instant case would have supported an instruction on voluntary manslaughter," but he again fails to identify any such evidence.

while laying in a bunk on the lower deck of the ship, during which he sustained many defensive wounds and was subsequently killed, possibly by a fireman's axe. There was no evidence presented that defendant acted in the heat of passion caused by adequate (or any) provocation. Any finding of provocation on the part of the jury would have been pure speculation. Therefore, the trial court did not err by denying defendant's request for an instruction on voluntary manslaughter. *Montague*, 338 Mich App at 37.

Because the trial court did not err by declining to provide a jury instruction that was not supported by the evidence, defendant cannot show how he was denied the right to present a defense. That right does not encompass the right to have the jury instructed on theories that are not supported by the evidence. See *Spaulding*, 332 Mich App at 653 ("A defendant has the right to a *properly* instructed jury . . . .") (emphasis added); *People v Canales*, 243 Mich App 571, 574; 624 NW2d 439 (2000) ("Jury instructions must include all the elements of the charged offense and must not exclude material issues, defenses, and theories *if the evidence supports them*.") (emphasis added).

## IV. FLIGHT INSTRUCTION

Defendant also argues that the trial court erred by instructing the jury as follows:

THE COURT: There has been some evidence in this case that the defendant ran away or hid after the alleged crime.

This evidence does not prove guilt. A person may run or hide for innocent reasons, such as panic, mistake, or fear. However, a person may also run or hide because of a consciousness of guilt.

You must decide whether that evidence is true, and if true, whether it shows that the defendant had a guilty state of mind.

We disagree with defendant's argument. We note that defense counsel never objected to the proposed instruction and indeed agreed with it on two occasions. He first acquiesced to the prosecutor's request that a flight instruction be given.[7] And then after the trial court provided the final instructions to the jury, defense counsel stated that he had no objections to the instructions as given. When a party affirmatively expresses satisfaction with a jury instruction, the issue is waived, and a waiver extinguishes any error. *People v Carter*, 462 Mich 206, 215; 612 NW2d 144 (2000).

---

[7] Before the instructions were given to the jury, the prosecutor asserted that defense counsel was not contesting that the flight instruction was warranted based on the evidence. Defense counsel did not interject to correct the prosecutor's representation to the court. Although defense counsel did not expressly affirm the prosecutor's representation of defense counsel's view, his failure to correct the prosecutor's representation of that view is an adoption of that position, i.e., that he had no issue with the flight instruction.

Relatedly, defendant argues that defense counsel was ineffective in failing to object to the flight instruction. We disagree. Generally, claims of ineffective assistance of counsel involve a mixed question of law and fact. *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). This Court reviews a trial court's factual findings for clear error, and we review de novo any constitutional determinations. *People v Matuszak*, 263 Mich App 42, 48; 687 NW2d 342 (2004). However, when no evidentiary hearing is held, as is the case here, this Court's review "is limited to mistakes apparent on the record." *People v Riley (After Remand)*, 468 Mich 135, 139; 659 NW2d 611 (2003).

A defendant has the right to the effective assistance of counsel. *Strickland v Washington*, 466 US 668, 686; 104 S Ct 2052; 80 L Ed 2d 674 (1984); *People v Aceval*, 282 Mich App 379, 386; 764 NW2d 285 (2009). Effective assistance of counsel is presumed, and the defendant bears a heavy burden of proving otherwise. *LeBlanc*, 465 Mich at 578. Generally, to establish a claim of ineffective assistance, a defendant must show that (1) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms and (2) there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different. *People v Trakhtenberg*, 493 Mich 38, 51; 826 NW2d 136 (2012).

"A criminal defendant is entitled to have a properly instructed jury consider the evidence against him." *People v Hawthorne*, 474 Mich 174, 182; 713 NW2d 724 (2006). In order for a trial court to provide a particular instruction, there must be evidence to support the instruction. *People v Johnson*, 171 Mich App 801, 804; 430 NW2d 828 (1988). Evidence of a defendant's flight is generally admissible in Michigan because it may indicate a consciousness of guilt. *People v Coleman*, 210 Mich App 1, 4; 532 NW2d 885 (1995). "Flight" includes such actions as "*fleeing from the scene of the crime*, *leaving the jurisdiction*, running from the police, resisting arrest, and attempting to escape custody." *Id*. (emphasis added).

In this case, the evidence showed that defendant suddenly "disappeared" from his job on board the Grayfox, leaving some of his possessions behind. According to the prosecution's theory, which was consistent with the evidence, this fleeing from the ship happened right after Orlow was killed. This would constitute "fleeing from the scene of the crime" and supports the flight instruction. Consequently, defense counsel was not ineffective in failing to object to the instruction. See *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010) ("Failing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel.").[8]

## V. CONSTITUTIONALITY OF MCL 769.1k(1)(b)(*iii*)

Defendant also argues that MCL 769.1k(1)(b)(*iii*) is unconstitutional. We disagree. Defendant concedes that this issue is unpreserved because he never raised the issue in the trial

---

[8] Additionally, in light of the other evidence presented against defendant, defendant has not established that the instruction that the jury could consider his flight was outcome determinative. *Trakhtenberg*, 493 Mich at 51.

court. "This Court reviews unpreserved issues, constitutional and nonconstitutional, for plain error" affecting substantial rights. *People v Hanks*, 276 Mich App 91, 92; 740 NW2d 530 (2007).

MCL 769.1k(1)(b)(*iii*) allows a court to impose "any cost reasonably related to the actual costs incurred by the trial court without separately calculating those costs involved in the particular case."[9] Defendant argues that this statute violates our Constitution's separation of powers because the statute constitutes an improper delegation by the Legislature to the judicial branch. This Court has already addressed this issue and held that the delegation of power is not unconstitutional. *People v Cameron*, 319 Mich App 215, 234-236; 900 NW2d 658 (2017). Defendant also asserts that the statute is facially unconstitutional because it violates a defendant's right to due process by creating the potential for bias in trial judges who are pressured to raise money in the form of criminal sanctions to fund the court. This Court has also addressed and rejected this same argument. See *People v Johnson*, 336 Mich App 688, 704-705; 971 NW2d 692 (2021). Because defendant's arguments have been considered and rejected by this Court, he cannot establish a plain error.

## VI. DEFENDANT'S STANDARD 4 BRIEF

Defendant raises several additional issues in his Standard-4 brief[10] none of which have merit.

### A. SUBSTITUTION OF COUNSEL

Defendant argues that the trial court, after receiving a letter from defendant dated March 26, 2021, should have appointed substitute counsel, or at a minimum further investigated defendant's complaints. We disagree.

A defendant must raise an issue in the trial court to preserve it for appellate review. *People v Heft*, 299 Mich App 69, 78; 829 NW2d 266 (2012). Defendant claims that he preserved this issue in his March 26, 2021 letter to the trial judge. The stated purpose of the letter was to discuss the "ineffective assistance of counsel." Defendant's stated grievances were that he had yet to receive a copy of the police report, that counsel failed to meet him in jail on two scheduled occasions, and that defendant did not feel that counsel cared about him. The letter closed with, "Sir I have no choice but to [illegible] you for help in this matter." Notably, defendant did not actually request new counsel. Therefore, although defendant raised concerns about his defense counsel's performance, the issue of substitution is unpreserved. This Court reviews unpreserved issues for plain error affecting substantial rights. *Hanks*, 276 Mich App at 92.

At the April 12, 2021 pretrial hearing following the court's receipt of defendant's letter, defendant's appointed counsel was not present, but with defendant's consent, Michael Boucher,

---

[9] MCL 769.1k has been amended since defendant's sentencing, see 2022 PA 199, but the substance of the statute is substantially the same. The amendment extended the deadline for allowing this revenue-generating system from October 1, 2022, to May 1, 2024.

[10] A pro se supplemental brief filed by a criminal defendant under Supreme Court Administrative Order No. 2004-6, Standard 4.

the head of the St. Clair County Public Defender Office, was present and represented defendant. The trial court noted that it had received defendant's letter and stated:

> I wanted to make a record that I received correspondence from Mr. Grasty and I had forwarded that to Mr. Boucher.
>
> Mr. Boucher -- my apologies. I forwarded that letter to Mr. Lepley [appointed counsel]. In the event that the issues in that letter need to [be] readdressed, we will readdress them later on down the road. But as this case is just now starting in Circuit Court, *I don't find it to be appropriate to address those matters at this point*. But we will keep an eye on that for you, okay, Mr. Grasty? [Emphasis added.]

Defendant responded, "Okay. Thank You."

The trial court clearly indicated that it was not going to take further action on defendant's letter at the moment, and defendant affirmatively agreed with this course of action. There is no indication that defendant ever raised this issue again with the trial court. Therefore, defendant is precluded from arguing that the court should have taken a different course of action, and defendant is not entitled to any relief. See *Carter*, 462 Mich at 215 (explaining that a waiver extinguishes any error); *Blazer Foods, Inc v Restaurant Props, Inc*, 259 Mich App 241, 252; 673 NW2d 805 (2003) (stating that a party may not take a position in the trial court and later seek redress on appeal that is based on a position contrary to that earlier position). In any event, the trial court did not plainly err by declining to sua sponte order substitution of counsel when such a request was never actually made. *Hanks*, 276 Mich App at 92.

## B. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant also argues that trial counsel was ineffective in several respects. We disagree.

As stated earlier, the effective assistance of counsel is presumed and the defendant bears a heavy burden of proving otherwise. *LeBlanc*, 465 Mich at 578. Generally, to establish ineffective assistance, a defendant must show that (1) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms and (2) there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different. *Trakhtenberg*, 493 Mich at 51.

Defendant argues that his trial counsel was ineffective in failing to impeach certain witnesses on certain topics. Defendant suggests that counsel chose harmless, irrelevant subject matter to impeach when there were other statements worthier of impeachment. Defendant lists 13 areas[11] in which Semerad allegedly offered inconsistent statements or testimony, and two areas in

---

[11] The 13 listed areas are: (1) whether board approval was required to allow someone to stay on board for an extended period of time; (2) when Semerad met defendant; (3) which keys were missing; (4) when did Orlow move onto the ship; (5) the length of time defendant was on board as of December 2019; (6) whether Semerad ever saw anything out of the ordinary between January

which Detective William Sharp offered inconsistent testimony,[12] but fails to explain if these were the areas on which counsel should not have attempted impeachment because they involved "harmless, irrelevant subject matter," or if they are areas that counsel should have addressed. The record shows that some of these areas were addressed by counsel, while others were not.

Decisions concerning the cross-examination and impeachment of witnesses are considered matters of trial strategy for which this Court will not substitute its judgment. *People v Horn*, 279 Mich App 31, 39; 755 NW2d 212 (2008); *People v McFadden*, 159 Mich App 796, 800; 407 NW2d 78 (1987). Counsel is not ineffective for simply failing to use all prior inconsistent statements to impeach witnesses. See *McFadden*, 159 Mich App at 800.

We have reviewed all of the areas identified by defendant and find no merit to his argument that counsel's impeachment was objectively unreasonable. The subject areas that defendant claims counsel should have pursued in impeachment were of minor significance. Defendant has not overcome the presumption that counsel reasonably exercised his professional judgment in cross-examining trial witnesses, and we will not review that performance further with the benefit of hindsight. See *Horn*, 279 Mich App at 39; *McFadden*, 159 Mich App at 800.

Defendant also alleges that his counsel was ineffective for other reasons. Several of these other arguments, pertaining to counsel's questioning of Hill and Madden, how the blood-spatter expert could have testified differently, counsel's failure to present "adversarial testing process in reference" to the mutilation count, and counsel's unsuccessful attempt to introduce a whisky bottle into evidence are unclear, woefully undeveloped, and unsupported by legal authority. We deem those arguments abandoned. See *Prince*, 237 Mich App at 197; *Kelly*, 231 Mich App at 640-641.

Defendant also argues that photographs of the knives that were found in the galley should have been excluded from evidence. We interpret the argument as being that defense counsel should have objected to the photographs. We disagree. The photographs were admissible because they were relevant. MRE 401, 402. Whether there were knives accessible on board the ship was highly relevant because there was evidence that Orlow had been stabbed repeatedly by a sharp object, like a knife. Notably, the photographs were not offered into evidence to show that defendant specifically used one of the pictured knives. They were offered only to show the types and quantities of knives available to defendant. Consequently, the photographs were relevant and admissible, and counsel was not ineffective in failing to lodge a meritless objection. See *Ericksen*, 288 Mich App at 201.

Defendant also contends that defense counsel was ineffective in failing to object to the testimony of Detective Sharp that he gave Dr. Spitz a fireman's axe from the ship that was identical

---

2020 and June 2020; (7) which areas were power washed; (8) timing of when defendant and Orlow switched rooms; (9) which room Orlow stayed in; (10) when Semerad last saw Orlow; (11) when the locks were changed; (12) whether there was running water on the ship; and (13) the access points to the ship.

[12] Defendant alleges that Det. Sharp offered inconsistent testimony regarding how many rooms were power-washed and whether one wall stain was positive for Orlow's blood.

-11-

to the one on which Hill had found blood. But defendant does not explain why the testimony was inadmissible other than to suggest that there was no scientific analysis done to support that the two axes were in fact identical. But the record is clear that Detective Sharp testified as a lay witness, not an expert. His lay opinion of the axe being identical to the one on which Hill had found blood was permissible because it was based on his own perceptions and was helpful to the jury's understanding of whether the axe that was given to Dr. Spitz resembled the axe with the blood. See MRE 701 (allowing a lay witness to offer testimony in the form of an opinion or inference if the opinion or inference is "(a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue"). Moreover, Detective Sharp never claimed any special skill at axe-identification. Therefore, counsel was not ineffective in failing to object to Detective Sharp's testimony. See *Ericksen*, 288 Mich App at 201. Likewise, defendant's suggestion that defense counsel should have objected to Hill's testimony that he saw markings in the wooden slat in Orlow's bunk bed is without merit. Hill was merely testifying to his personal observations, not as an expert. MRE 701.

Defendant also argues that counsel should have objected to Dr. Spitz's testimony that the fire axe could have been used to dismember Orlow. We disagree. In general, "relevant evidence" is admissible, MRE 402, and is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence," MRE 401. Evidence that the fire axe was capable of dismembering Orlow's body was relevant to the charge of mutilation of a dead body. Indeed, Dr. Spitz did not say definitively that the axe was used for the dismemberment; he only stated that the axe was *consistent* with the type of instrument that was used. There was no basis for trial counsel to object to this testimony. *Ericksen*, 288 Mich App at 201.

Lastly, defendant claims that his trial counsel provided an ineffective closing argument by misstating the evidence. This argument also is without merit. Defense counsel at one point argued that because both defendant's and Orlow's DNA appeared on the axe handle, it suggested that both of them were handling the axe, which indicated that there was "some kind of mutual thing going on," "it's not one person attacking another, it's a mutual situation." Defendant asserts that the argument was improper because there was no testimony or evidence to support the view that the DNA had specifically been deposited on the axe by the donors deliberately touching the axe handle. Defendant fails to appreciate that the purpose of closing argument is to allow the parties to argue the evidence and any reasonable inferences arising from the evidence to support their case. See *People v Christel*, 449 Mich 578, 599-600; 537 NW2d 194 (1995). With DNA found on the axe, one reasonable inference is that the DNA was transferred there by someone physically touching the axe. Defense counsel was attempting to argue that Orlow also had been wielding the axe, which would cut against the prosecution's theory that defendant ambushed Orlow while he was lying in bed. The argument was objectively reasonable. Moreover, it is not reasonably likely that defense counsel's statement was outcome determinative. The jurors were instructed that the attorney's statements were not evidence. Jurors are presumed to follow their instructions. *People v Solomonson*, 261 Mich App 657, 663; 683 NW2d 761 (2004).

## C. EVIDENTIARY HEARING AND ADMISSIBILITY OF EVIDENCE

Defendant also asserts that he should have an "evidentiary hearing." To the extent that this constitutes a request for this Court to remand for a hearing, the request should have been presented

in a motion and not in a brief on appeal. See MCR 7.211. In substance, however, defendant seems to be arguing that an "evidentiary hearing" is needed to determine the admissibility of certain evidence admitted at trial. We disagree that the need for any such hearing has been established.

Defendant suggests that the evidence that his fingerprints were found on the garbage bag recovered from the dryer was not admissible because there was no evidence that the prints "could only have been impressed at the time the crime was committed." We disagree. The fingerprint evidence clearly is relevant under MRE 401. The fact that defendant's fingerprints were found on the bag makes it more probable that he was the person who placed the clothing in the bag and placed the bag in the dryer. Defendant was free to argue that his fingerprints could have gotten on the bag at some other time, or otherwise challenge the weight of this evidence. In fact, defense counsel solicited testimony from a Michigan State Police forensic scientist agreeing that he had "no idea at all" when defendant's fingerprints may have been placed on the bag.

Defendant also claims that the preliminary testing for the presence of blood is not admissible because of its preliminary nature. We disagree. Hill testified that while the test he used was a presumptive or preliminary test, it only was such because the test will yield positive results for, not only human blood, but higher-primate blood and ferret blood. With there being no evidence of any bleeding primates or ferrets ever being on board the ship, the testing was relevant because it made it more probable that human blood was present. Furthermore, the subsequent DNA testing confirmed that many of the areas that tested positive for human blood in fact contained human DNA.[13]

Defendant next takes issue with the testimony from the prosecution's DNA expert, but his argument is unclear and undeveloped, and supported exclusively by citation to caselaw from foreign jurisdictions. Accordingly, the issue is abandoned. See *Prince*, 237 Mich App at 197; *Kelly*, 231 Mich App at 640-641.

## D. PROSECUTORIAL MISCONDUCT

Defendant suggests that the prosecutor engaged in several instances of misconduct requiring reversal. We deem these issues abandoned. Defendant in his brief has offered either cursory or no argument to support his positions. Instead, he merely cites principles of law, coupled with excerpts from the transcripts. He provides no argument as to how the cited law applies to the cited portions of transcript. An appellant may not merely announce a position and leave it to this Court to rationalize the basis for the claims. *Kelly*, 231 Mich App at 640-641.

---

[13] Defendant claims that the DNA expert did not test for blood. While this is technically true, the fact that human DNA was found from that sample is evidence that the substance was indeed from a human.

-13-

## E. FAILURE TO INVESTIGATE

Defendant also appears argue that his due-process rights were violated because the police failed to investigate some aspects of the crime scene. We disagree.

It appears that defendant may be attempting to raise a *Brady*[14] claim. To the extent that he makes such an argument, it is unconvincing.

"A criminal defendant has a due process right to obtain exculpatory evidence possessed by the prosecutor if it would raise a reasonable doubt about defendant's guilt." *People v Cox*, 268 Mich App 440, 448; 709 NW2d 152 (2005); see also *Brady v Maryland*, 373 US 83, 87; 83 S Ct 1194; 10 L Ed 2d 215 (1963). In order to establish such a due-process violation, a defendant must prove that "(1) the prosecution has suppressed evidence; (2) that is favorable to the accused; and (3) that is material." *People v Chenault*, 495 Mich 142, 150; 845 NW2d 731 (2014). This applies to evidence within the government's control, even if it was unknown to the prosecution. *Id*. Evidence is favorable to the defense when it is either exculpatory or impeaching. *Id*., citing *Giglio v United States*, 405 US 150, 154; 92 S Ct 763; 31 L Ed 2d 104 (1972). Evidence is "material" if, had the evidence been disclosed to the defense, there is a reasonable probability that the result of the proceeding would have been different. *Chenault*, 495 Mich at 150. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. (quotation marks and citation omitted).

Defendant's argument fails for the simple reason that it is not based on the failure to disclose exculpatory evidence, but instead is premised on the police's alleged failure to investigate further in search of possible exculpatory evidence. Although exculpatory evidence needs to be disclosed, the duty does not extend to seeking out and finding exculpatory evidence. *People v Sawyer*, 222 Mich App 1, 5; 564 NW2d 62 (1997). Accordingly, defendant has not established plain error.

Affirmed.

/s/ Mark T. Boonstra
/s/ Michael F. Gadola
/s/ Allie Greenleaf Maldonado

---

[14] *Brady v Maryland*, 373 US 83; 83 S Ct 1194; 10 L Ed 2d 215 (1963).